IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| LARRY ANDERSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:11-cv-110-MEF |
| | ) | (WO – Publish) |
| GEORGIA-PACIFIC | ) | |
| WOOD PRODUCTS, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

### I. INTRODUCTION

The plaintiff, Larry Anderson ("Anderson"), claims that his former employer, Georgia-Pacific Wood Products, LLC ("Georgia-Pacific"), is liable for disability discrimination under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as amended. Georgia-Pacific has filed a motion for summary judgment (Doc. #57). Upon consideration of the parties' briefs and the evidence presented in support thereof, the Court concludes that Georgia-Pacific's motion is due to be GRANTED on all of Anderson's claims.

### II. JURISDICTION AND VENUE

This Court has federal question jurisdiction over Anderson's claims under 28 U.S.C. § 1331. The parties do not claim that the Court lacks personal jurisdiction over them, nor do they dispute that venue is proper under 28 U.S.C. § 1391(b), and the Court finds adequate allegations supporting both.

### III. THE RELEVANT FACTS

A.   **Anderson's Employment with Georgia-Pacific**

  1.   *Anderson's Job as a Maintenance Technician*

From around 1997 to 2008, Anderson worked as a maintenance technician at a mill in Thorsby, Alabama (the "Thorsby facility"), first with International Paper, and then with Georgia-Pacific after it took over the Thorsby facility in March 2007. (Compl. ¶¶ 6–7.) At the Thorsby facility, Georgia-Pacific manufactures engineered wood products, including laminated veneer lumber ("LVL"). LVL consists of layers of wood veneer and glue and is compressed to make structural timbers for use in homes and commercial buildings. (Deposition of John Skedgell ("Skedgell Dep.") at 7:21–25, Doc. #71-1.) Boilers, dryers, presses, saws, glues, and chemicals are used to manufacture LVL. Due to the manufacturing process, exposure to heat, humidity, fumes, and wood dust is common at Georgia-Pacific facilities. In general, the temperature and humidity at the Thorsby facility are high, particularly in the areas around the press and the boilers. (Skedgell Dep. at 81:9–18, Doc. #58-2.)[1]

As a maintenance technician, Anderson was responsible for performing preventative maintenance, repairs, and inspections on all of the equipment at the Thorsby facility, and troubleshooting electrical and mechanical problems. (Deposition of Larry Anderson ("Anderson Dep."), at 62:4–14; 66:17–67:15, Doc. #58-3; Anderson Dep. Ex. 10, Doc. #59-4, at 19.) Anderson's job duties included cleaning and oiling the equipment, fabricating steel

---

  [1]   Anderson contends that employees in certain positions at the Thorsby facility, such as senior press line operators, are exposed to less heat, humidity, and dust because those employees work in air-conditioned booths. (Anderson Dep. at 185:1–16, Doc. #71-2.)

and welding parts, installing new equipment and replacement parts, aligning the equipment, and using and carrying hand and power tools throughout the Thorsby facility (Anderson Dep. at 62:4–64:14; 66:17–68:1; Anderson Dep. Ex. 10, Doc. #59-4, at 20.)  Anderson's job required him to walk and stand for four hours a day, and to stoop, kneel, crouch, crawl, handle large objects, and reach for two hours a day.  (Anderson Dep. Ex. 10, Doc. #59-4, at 19.)

### 2. *Anderson's Disciplinary Warnings*

In 2007, Kevin Dozier ("Dozier"), an African-American maintenance worker, and another Caucasian maintenance worker, were terminated after a fire occurred at the Thorsby facility.[2]  Anderson went to the main office to complain about the terminations on August 30, 2007. (Anderson Dep. at 107:6–10; 108:7–11, Doc. #58-3.)  Anderson was visibly upset; he called the management "liars" and used profanity.  (Anderson Dep. at 109:1–4; Anderson Dep. Ex. 18, Doc. #58-3, at 95.)   On August 31, 2007, Anderson alleged that he had overheard coworkers using racial slurs but refused to disclose the names of the coworkers to the human resources manager, Greg Green ("Green").[3]  (Anderson Dep. Ex. 18, Doc. #58-3, at 95; Anderson Dep. at 111:12–19.)  On September 1, 2007, Anderson was disruptive during a pre-shift meeting and was counseled by his supervisor.  (Anderson Dep. Ex. 18, Doc. #58-3, at 95.)  On September 12, 2007, Anderson received a written warning for his

---

[2]   Georgia-Pacific told Anderson that both employees were fired for failing to follow the safety protocol that Anderson prepared, but Anderson alleges that Dozier was fired because he was African-American.  (Anderson Dep. at 109:6–16, Doc. #58-3.)

[3]   Green resigned his employment with Georgia-Pacific on May 31, 2008, and Bob Brown ("Brown") became the acting human resources manager at the Thorsby facility until Green's position was filled.  (Brown Aff. ¶ 7, Doc. #59-2.)

disruptive behavior and for failing to cooperate with management in its investigation of the racial discrimination allegations he made on August 31, 2007.  (Anderson Dep. Ex. 18, Doc. #58-3, at 95.)

Between September 2007 and April 2008, Anderson received two more disciplinary warnings.  On March 10, 2008, Anderson received another warning for his pattern of unsafe conduct after he injured his left thumb while using a bench grinder to sand pieces of steel. (Anderson Dep. Ex. 22, Doc. #58-3, at 97; Anderson Dep. Ex. 20, Doc. #58-3, at 96; Anderson Dep. at 119:14–24.)[4]  On April 15, 2008, Anderson and another employee missed a scheduled training without calling in and they both received written warnings for attendance issues.  (Def. Exs. 30 & 31, Doc. #58-6, at 6–7.)

## B.    Anderson's Medical Disability

Throughout his employment at the Thorsby facility, Anderson suffered from chronic obstructive pulmonary disease ("COPD")[5] due to his military service.  His condition required him to take leave from work on an intermittent basis under the Family Medical Leave Act

---

[4]   After receiving the safety warning, Anderson lodged a battery of complaints with various agencies.  On March 12, 2008, Anderson filed a discrimination charge against Georgia-Pacific with the Equal Employment Opportunity Commission ("EEOC"), alleging retaliation for his reporting of racial discrimination and for his wife's filing of an EEOC charge for sexual discrimination. (Anderson Dep. Ex. 65, Doc. #58-3, at 134.)  On March 13, 2008, Anderson e-mailed a complaint to the Occupational Safety and Health Administration ("OSHA"), alleging that Georgia-Pacific issued its March 10, 2008 warning as retaliation for his making safety complaints.  (Anderson Dep. Ex. 25, Doc. #58-3, at 106.)  Finally, on March 17, 2008, a charge was filed by the union on Anderson's behalf with the National Labor Relations Board ("NLRB"), alleging that Anderson had been "harassed, intimidated and written up because of his activities on behalf of the [United Steelworkers labor union]."  (Anderson Dep. Ex. 25, Doc. #58-3, at 105.)

[5]   COPD is a progressive disease that makes it hard for the patient to breathe due to reduced airflow in and out of the lungs.  *What is COPD?*, National Heart, Lung, and Blood Institute, National Institutes of Health, *available at* http://www.nhlbi.nih.gov/health/health-topics/topics/copd/ (last updated June 8, 2012).

("FMLA"). (Anderson Dep. Ex. 17, Doc. #59-4.)   Anderson's physician, Lucille Collins ("Dr. Collins"), submitted an FMLA certification for Anderson in November 2006, indicating that Anderson would require periodic treatment for his COPD; she submitted a similar certification in June 2007.  (Anderson Dep. Ex. 14, Doc. #59-4; Skedgell Dep. Ex. 13, Doc. #59-3.)  Dr. Collins also submitted return-to-work notes for Anderson on five occasions between October 8, 2007, and May 2, 2008.  (Anderson Dep. Ex. 17, Doc. #59-4, at 31–35.)  None of these return-to-work notes imposed any restrictions on Anderson's normal job duties.

On May 9, 2008, Anderson was assigned to help install a new motor for the LVL hog. (Declaration of DeWayne Winslett ("Winslett Decl.") ¶ 6, Doc. #58-6.)  After Anderson complained that the area was too dusty, the ground was wet down so that the dust would not be airborne.  (Winslett Decl. ¶ 6.)  The following day, Anderson informed his supervisor, DeWayne Winslett ("Winslett"), that he had spoken with his doctor and that he might be going to the emergency room because of his trouble breathing due to working in the dust the previous day.  (Winslett Decl. ¶ 7.)  Anderson told Winslett that "if he wanted to push the issue, he could be on 100 percent disability."  (Winslett Decl. ¶ 7.)

The following week, on May 14, 2008, Green met with Anderson and Winslett to talk about Anderson's disability and provided Anderson with a new FMLA medical certification form and job requirements form for Anderson's doctor to complete.  (Affidavit of Bob Brown ("Brown Aff.") ¶ 6; Def.'s Ex. A, Doc. #59-2.)  The job requirements form required Dr. Collins to assess if Anderson could perform the essential functions of his job.  (Brown Aff. Ex. A, Doc. #59-2, at 10.)  On May 30, 2008, Anderson turned in the job requirements

form, in which Dr. Collins had noted that Anderson's restrictive lung disease permanently restricted him from working in conditions of extreme temperatures and humidity and from exposure to wood dust, fumes, gases, or chemicals.  (Anderson Dep. Ex. 33, Doc. #58-3, at 109–111; Brown Aff. ¶ 8, Doc. #58-1.)  Dr. Collins also noted that Anderson would require the protection of a respirator as an accommodation of his permanent physical restrictions if he was working in areas with exposure to dust and fumes.  (Anderson Dep. Ex. 33, Doc. #58-3, at 109.)  On the job requirements form, Dr. Collins indicated that Anderson could return to work on May 30, 2008, and that he could perform the essential functions of his job if he wore a respirator when working around dust, fumes, and chemicals.  (Pl.'s Ex. 3, Doc. #71-1, at 37.)

After Anderson returned the job requirements form, Dale Mims ("Mims"), the safety manager at the Thorsby facility, was consulted about the feasibility of Anderson wearing a respirator.  (Def.'s Ex. E, Doc. #59-2, at 14.)  On June 3, 2008, Mims informed Brown that Anderson did not pass a 2002 pulmonary function test and that the registered nurse who administered the test told management that Larry Anderson could not wear a full-faced respirator.  (Skedgell Dep. 103:23–25, Doc. #71-1; Def.'s Ex. E, Doc. #59-2.)  The 2002 test indicated that Anderson had mild restrictive lung disease and predicted his forced expiratory volume over one second to be 68 percent (FEV-1).[6]  (Def.'s Ex. E, Doc. #59-2, at 15.)  A

---

[6]   On June 17, 2008, Dr. Collins submitted a statement to MetLife, Georgia-Pacific's short-term disability insurance provider, in which she predicted Anderson's lung capacity to be 31%. (Anderson Dep. Ex. 43, Doc. #59-4, at 38.)  According to the pulmonary functions tests Mr. Anderson underwent while on short-term leave, his predicted forced expiratory volume in one second (FEV-1) had declined to 25 percent as of July 24, 2008, and to 23 percent by August 8, 2008. (Anderson Dep. Exs. 44 & 48, Doc. #59-4.)

registered nurse noted on the 2002 test results that Anderson did not need to be a part of the confined space safety rescue team, which required him to wear a respirator or oxygen mask. (Brown Aff. ¶ 9; Def.'s Ex. E, Doc. #59-2, at 15.)[7]

**C.     Anderson's Requests for Reasonable Accommodations, Short-Term Paid Leave, and Termination**

On June 4, 2008, Brown met with the Thorsby facility manager, Gary Bittner ("Bittner"), and Anderson to talk about the restrictions imposed by Dr. Collins on the job requirements form. (Brown Aff. ¶ 10, Doc. #59-2.) At the meeting, Brown told Anderson that he had a copy of the 2002 pulmonary function test indicating that Anderson could not wear a full-face respirator, and Anderson responded that his lung condition had become worse over the years. (Brown Aff. ¶ 10.) The 2002 test results and Anderson's statement to Bittner and Brown that his lung condition had worsened led Brown to believe that Anderson's COPD prevented him from wearing a full-face respirator. Thus, Brown concluded that providing a respirator to Anderson was not a reasonable accommodation. (Brown Aff. ¶ 10.) Georgia-Pacific did not provide Anderson with an updated functional lung test after receiving Dr. Collins's notes about Anderson's need for a respirator. (Skedgell Dep. at 105:19–25, Doc. #71-1.)[8]  It is undisputed that when International Paper owned the Thorsby facility, it gave Anderson a respirator sometime around 1997 or 1998, which

---

[7]     The parties dispute whether Anderson quit the safety rescue team voluntarily or was removed, but it is undisputed that Anderson stopped participating on the confined space safety rescue team after he failed the pulmonary function test. (*See* Anderson Dep. at 69:4–10, Doc. #59-4) ("I quit the confined space rescue team when I failed a pulmonary functions test.").

[8]     After being placed on short-term sick leave, Anderson underwent two pulmonary function tests in July and August of 2008.   His forced expiratory volume in one second (FEV-1) was 25 percent of predicted value on July 24, 2008, and 23 percent of predicted value on August 8, 2008. (Anderson Dep. Exs. 44 & 48, Doc. #59-4.)

Anderson kept in his locker.  (Anderson Dep. at 76:8–10; 77:10–18, Doc. #71-2.)  Anderson

wore the respirator when needed in 2007.  (Anderson Dep. at 76:16–77:5, Doc. #71-2.)

At the June 4, 2008 meeting, Brown and Bittner asked Anderson about

accommodations other than wearing a respirator.  (Brown Aff. ¶ 11.)  After stating his

opinion that Dr. Collins's restrictions did not apply to the entire Thorsby facility, Anderson

advised that, in the past, his supervisors excused him from working in the dustiest areas of

the plant.  He also suggested they allow him to wear an over-the-counter dust mask.  Brown

and Bittner responded that his job required him to work throughout the plant, where he was

exposed to the conditions to which Dr. Collins had objected—chemicals, sprays, dust, and

extreme heat and humdity.  (Brown Aff. ¶ 11.)  After meeting with Anderson, Brown

considered reassigning Anderson to another position but concluded that, in light of Dr.

Collins's restrictions, there were no other available positions at the Thorsby facility for which

Anderson could perform the essential functions with or without a reasonable accommodation.

On June 5, 2008, Brown sent Anderson a letter summarizing the previous day's

meeting and advising Anderson that there were no available positions at the Thorsby facility

that would satisfy his doctor's restrictions because dust, fumes, and chemicals were present

throughout the Thorsby facility.  (Def.'s Ex. F, Doc. #59-2, at 17.)  In his letter, Brown also

rejected Anderson's suggestion of wearing an over-the-counter dust mask, noting such masks

were not impervious to heat, humidity, sprays, solvents, and even dust unless the mask is

properly tested for the correct fit each time it is worn.  (Def.'s Ex. F, Doc. #59-2, at 17.)  At

the end of the letter, Brown advised Anderson that unless Anderson corrected the information

he had submitted or provided new information from his doctor, he would be terminated from

his employment with Georgia-Pacific. (Def.'s Ex. F, Doc. #59-2, at 18.)

Anderson responded to Brown by email, reiterating that Dr. Collins's permanent restrictions applied only to the LVL houses and the chip bins and that Dr. Collins had tried to contact Brown by phone to explain this. (Def.'s Ex. G, Doc. #58-1, at 19.) Anderson pointed out that, for five years, he had been excused from working in the problem areas and that he had spent less than 2 percent of his time in them. (Def.'s Ex. G, Doc. #58-1, at 19.) Brown responded that Dr. Collins's restrictions marked a "dramatic change" from his condition in the past in that Anderson was now restricted from conditions that were present throughout the facility, when in the past, he was not. Brown informed Anderson that he had filed an initial claim on his behalf for short-term sick leave to last six months, through December 8, 2008, and that he would be reevaluated for return-to-work at the end of the approved period. (Brown Aff. ¶ 16; Def.'s Ex. N, Doc. #58-1, at 27.)

In October and November of 2008, Anderson requested to be evaluated for return to work. (Def.'s Exs. K, L, & M, Doc. #58-1, at 24–26.) In this correspondence, he informed Geogia-Pacific that the medications he had been taking over the previous four months had greatly improved his condition, and he requested that a neutral physician of Georgia-Pacific's choosing perform another "fit test." (Def.'s Exs. K, L, & M, Doc. #58-1, at 24–26.) Brown responded that Georgia-Pacific had no reason to question the previous conclusions of Anderson's personal physician and Anderson's previous admission that he would not be able to pass a pulmonary function test. (Def.'s Ex. K, Doc. #58, at 24.)

On December 2, 2008, Brown again rejected Anderson's request to be evaluated by another physician and reiterated that there were no available positions for which he could

perform the essential functions given the medical restrictions imposed by Dr. Collins. (Def.'s Ex. N, Doc. #58-1, at 27.)  Brown further advised Anderson that unless he provided Georgia-Pacific with new information that his medical condition had improved to allow him to perform the essential functions of his job as a maintenance technician by December 8, 2008, Georgia-Pacific would consider him to have voluntarily resigned his employment. (Def.'s Ex. N, Doc. #58-1, at 27.)  Having not received any information from a physician about any change in Anderson's medical restrictions, Georgia-Pacific sent Anderson a notice of termination on December 9, 2008.  (Def.'s Ex. Q, Doc. #58-1, at 30.)

## D.   **Anderson's Applications for Disability Benefits During Short-Term Leave**

Shortly after being placed on short-term paid leave, Anderson began the process of applying for social security disability insurance ("SSDI") and veteran's disability benefits. On July 9, 2008, Anderson filed an application for increased compensation based on his unemployability with the Department of Veterans Affairs ("DVA"), declaring under oath that he was "let go from [his] job at Georgia-Pacific because of [his] COPD condition . . ." and that his "service-connected disabilities preclude [him] from obtaining gainful employment." (Def.'s Ex. G, Doc. #59-5, at 2.)  On April 29, 2009, the DVA issued a Rating Decision that stated that Anderson was only 70 percent disabled as of October 14, 2008, due to his post-traumatic stress disorder ("PTSD") and alcohol abuse in early remission.  (Def. Ex. J, Doc. #59-8.)  On March 10, 2010, the DVA issued another Rating Decision, in which it increased its evaluation of Anderson's COPD to 100 percent disabling, noting that "[a]n evaluation is granted whenever there is forced expiratory volume in one second (FEV-1) less than 40 percent predicted value."  (Anderson Dep. Ex. 60, Doc. #59-4, at 54.)

On August 28, 2008, Anderson filed a disability report with the Social Security Administration ("SSA"), in which Anderson stated that he was "unable to perform any occupation" as of June 3, 2008, because of his conditions, which included COPD, PTSD, an undiagnosed skeletal disorder, a herniated cervical disc, and sleep apnea. (Anderson Dep. Ex. 10, Doc. #59-4, at 18.) In his report, Anderson explained that he "become[s] short of breath with physical activity and exposure to high temperatures" and that he "use[s] oxygen when sleeping, when going outside, and when needed." (Anderson Dep. Ex. 10, Doc. #59-4, at 18.) On November 13, 2008, Anderson completed his application for SSDI, stating under oath that he became unable to work on June 3, 2008, because of his disability, and that he was still unable to work. (Anderson Dep. Ex. 58, Doc. #59-4, at 118.) Around April 11, 2009, the SSA notified Mr. Anderson that he became "disabled" under its rules as of October 1, 2008. (Anderson Dep. Ex. 4, Doc. #58-3, at 77.) Anderson later urged the SSA to declare him disabled as of June 3, 2008, the last day of his active employment with Georgia-Pacific.

## IV. LEGAL STANDARD

A motion for summary judgment looks to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A court should grant summary judgment when the pleadings and supporting materials show that no genuine dispute exists as to any material fact and that the moving party deserves judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying" the relevant documents that "it believes demonstrate

the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To shoulder this burden, the moving party can present evidence to this effect. *Id.* at 322–23. Or he can show that the non-moving party has failed to present evidence in support of some element of his case on which he ultimately bears the burden of proof. *Id.*

If the moving party meets its burden, the non-movant must then designate, by affidavits, depositions, admissions, or answers to interrogatories, specific facts showing the existence of a genuine issue for trial. *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593–94 (11th Cir. 1995). And a genuine issue of material fact exists when the non-moving party produces evidence that would allow a reasonable fact-finder to return a verdict in his favor. *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001). Thus, summary judgment requires the non-moving party to "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. Indeed, a plaintiff must present evidence demonstrating that he can establish the basic elements of his claim, *Celotex,* 477 U.S. at 322, because "conclusory allegations without specific supporting facts have no probative value" at the summary judgment stage. *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985).

A court ruling on a motion for summary judgment must believe the non-movant's evidence. *Anderson*, 477 U.S. at 255. It also must draw all justifiable inferences from the evidence in the nonmoving party's favor. *Id.* After the non-moving party has responded to the motion, the court must grant summary judgment if there exists no genuine dispute of material fact and the moving party deserves judgment as a matter of law. *See* Fed. R. Civ. P. 56(c).

## V. DISCUSSION

**A.**   **Anderson's Failure-to-Accommodate Claim Under § 42 U.S.C. § 12112(a)**

The ADA prohibits an employer from discriminating against a "qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  In order to establish a prima facie claim of discrimination under the ADA, a plaintiff must show that (1) he was disabled; (2) he was a "qualified individual" at the relevant time; and (3) he was discriminated against because of his disability.  *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001).  Georgia-Pacific does not dispute that Anderson has satisfied the first element—that Anderson was "disabled" under the ADA.  The other two prongs, however, are contested by the parties.

A "qualified individual with a disability" is an "individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).  Essential functions are "the fundamental job duties of a position that an individual with a disability is actually required to perform."  *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1365 (11th Cir. 2000) (citing 29 C.F.R. § 1630.2(n)(1)).  If a plaintiff is unable to perform an essential function, even with a reasonable accommodation, he is not a qualified individual for purposes of the ADA.  *Davis v. Fla. Power & Light Co.*, 205 F.3d 1301, 1305 (11th Cir. 2000).  In other words, "a plaintiff who is totally disabled and unable to work at all is precluded from suing for discrimination" under the ADA.  *See Slomcenski v. Citibank, N.A.*, 432 F.3d 1271, 1280 (11th Cir. 2005) ("[T]he ADA reserves its protections for individuals still able to perform the essential functions of a job, albeit perhaps with reasonable accommodation . . . .").

The third element—that the plaintiff was discriminated against because of his disability—may be established by showing that an employer failed to "mak[e] reasonable accommodations to the known physical or mental limitations of the individual," unless the employer can demonstrate that the requested reasonable accommodation would impose an "undue hardship on the operation of [its] business."  42 U.S.C. § 12112(b)(5)(A); *see also Holly v. Clairson Indus.*, 492 F.3d 1247, 1262 (11th Cir. 2007) ("[A]n employer's failure to reasonably accommodate a disabled individual *itself* constitutes discrimination, so long as that individual is "otherwise qualified," and unless the employer can show undue hardship." (emphasis in original)).  Reasonable accommodations may include:

> job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9)(B).   Although the ADA requires an employer to make "reasonable accommodations" for an employee's known disability, "an employer is not required to accommodate an employee in any manner which that employee desires."  *Earl*, 207 F.3d at 1367 (quoting *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir. 1997)).  An accommodation is reasonable and thus required under the ADA "only if it enables the employee to perform the essential functions of the job."  *Holly*, 492 F.3d at 1256; *see also* 29 C.F.R. § 1630.2(o)(1)(ii) (defining "reasonable accommodation" as "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position").

While the ADA may require that the employer "restructure a particular job by altering

-14-

or eliminating some of its marginal functions," *Lucas*, 257 F.3d at 1260, the Eleventh Circuit

has made it clear that "the ADA does not require the employer to eliminate an essential

function of the plaintiff's job" to accommodate an employee's disability.  *Holly*, 492 F.3d

at 1256 (quoting *D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1224 n.2 (11th Cir.

2005)).  The burden of identifying an accommodation that would allow a qualified individual

to perform the job rests with that individual, as does the ultimate burden of persuasion that

the requested accommodation is a reasonable one.  *Stewart*, 117 F.3d at 1286.

Anderson contends that Georgia-Pacific discriminated against him by failing to

provide him with the following requested accommodations: (1) excusing Anderson from

working in the dustiest areas of the plant that most exacerbated his lung condition—the LVL

bag and hog houses—unless absolutely necessary, and allowing Anderson to wear a

respirator when he is required to work in those areas;[9] or (2) reassigning Anderson to a

position in which he could work in an air-conditioned booth, such as the senior press line

---

[9]   The Eleventh Circuit has held that "the duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has been made" by the employee. *Gaston v. Bellingrath Gardens & Home, Inc.*, 167 F.3d 1361, 1363 (11th Cir. 1999).  Georgia-Pacific argues that Anderson never actually requested a respirator as an accommodation for his lung condition, reasoning that the need for a respirator was only mentioned by his physician on the Job Requirements/Essential Functions form Anderson submitted at the end of May 2008.  The Court is unconvinced by this argument.  First, the Eleventh Circuit has indicated that the request for an accommodation need not be made directly by the employee, but can be made by a representative. *See, e.g.*, *Warren v. Volusia Cnty., Fl.*, 188 Fed. App'x 859, 863 (11th Cir. 2006) (dismissing case where plaintiff never requested any accommodation, either on her own or through a representative). Furthermore, the form that Anderson submitted to Georgia-Pacific clearly lists Anderson's use of a respirator when working around dust, fumes, or chemicals as a necessary "accommodation" for Anderson's lung condition. (Anderson Dep. Ex. 33, Doc. #58-3.)  Because Anderson submitted this form to Georgia-Pacific (Brown Aff. ¶ 8, Doc. #59-2), the Court concludes that the form constituted a specific demand by Anderson.  Moreover, the record evidence shows that Georgia-Pacific itself treated Dr. Collins's notes about the need for a respirator as a request for an accommodation when it consulted with the safety manager at the facility to discern Anderson's ability to wear a respirator in light of his lung condition.

operator position.

Georgia-Pacific argues that, under the Supreme Court's holding in *Cleveland v. Policy Management Systems*, 526 U.S. 795, 805 (1999), Anderson's successful applications for disability benefits from the SSA and the DVA, in which he stated that he became unable to work and unemployable as of June 3, 2008,[10] because of various disabling conditions, preclude him from bringing an ADA claim.  Because Anderson has failed to provide the Court with a sufficient explanation that reconciles the inconsistencies between his statements to the SSA and the DVA and his assertion that he is a qualified individual under the ADA, Georgia-Pacific argues, his ADA claim must fail.  Accordingly, the threshold issue this Court must decide is whether Anderson's ADA claim is precluded by the sworn statements he made in support of his applications for social security and veterans disability benefits and his receipt of those benefits.

To obtain social security disability benefits, an applicant must prove that he is disabled—that is, he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuing period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999). To get benefits, the applicant's impairment must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national

---

[10]  In his application for social security disability benefits, Anderson stated that he became unable to work because of his disability on June 3, 2008.  (Doc. #58-3, at 118.)  In his application to the DVA for increased compensation because of his unemployability, Anderson stated that he became too disabled to work on June 6, 2008.  (Doc. #59-5, at 5.)

economy."  42 U.S.C. § 423(d)(2)(A).

Sworn statements claiming total disability that are made to obtain disability benefits do not automatically preclude a suit under the ADA, and there is no "special legal presumption" against the success of an ADA claim made by a person who has applied for and received disability benefits from the SSA.  *Cleveland*, 526 U.S. at 805.   Nevertheless, to defeat summary judgment, an ADA plaintiff, who has previously sworn in a social security benefits application that he is unable to work *any* job, in *any* capacity, must provide an explanation sufficient to "warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good faith belief in, the earlier statement, the plaintiff could nonetheless perform the essential functions of [his] job, with or without reasonable accommodation."  *Id.* at 806–07 (internal quotations omitted).

Thus, under *Cleveland*, a court's task is to "decide whether [a] plaintiff's assertions are genuinely in conflict, and if so, evaluate [the] plaintiff's attempt to explain away the inconsistency."  *Musarra v. Vineyards Dev. Corp.*, 343 F. Supp. 2d 1116, 1121 (M.D. Fla. 2004) (citing *Detz v. Greiner Indus., Inc.*, 346 F.3d 109, 118 (3d Cir. 2003)).  A plaintiff may resolve this inconsistency by pointing to a reasonable accommodation not taken into account as a factor in the SSA's disability determination that, if made, would have allowed the plaintiff to perform the essential functions of the job he holds or desires.  *Kurzweg v. SCP Distrib., LLC*, 424 Fed. App'x 840, 843–44 (11th Cir. 2011).

The Eleventh Circuit has explained that whether a certification of total disability on a social security disability application is inconsistent with an ADA claim depends on the "facts of the case, including the specific representations made in the application for disability benefits and the nature and extent of the medical evidence in the record."  *Talavera v. Sch.*

*Bd. of Palm Beach Cnty.*, 129 F.3d 1214, 1220 (11th Cir. 1997).  Moreover, it is well settled that "an ADA plaintiff is estopped from denying the truth of any statements made in her disability application."  *Id.*

The Court concludes that Anderson has failed to provide a sufficient explanation reconciling his sworn statements to the SSA and DVA that he was unable to work and permanently unemployable, and his corresponding, yet inconsistent contention here that at the relevant times—when he was placed on short-term paid leave and when he was finally terminated—he was physically capable of performing the essential functions of his job or any other job at the Thorsby facility with a reasonable accommodation.  Anderson explains that he began pursuing disability benefits only after Georgia-Pacific placed him on short-term, paid, disability leave based on his doctor's permanent restrictions.  Anderson further explains that he could have performed the essential functions of his job if Georgia-Pacific had provided him the accommodations he requested.  Specifically, Anderson contends that he would have been able to perform the essential functions of his job if Georgia-Pacific had accommodated the following requests: (1) to continue being excused from working in the dustiest areas of the plant unless absolutely necessary and allowing him to use a respirator when required to work in those areas; or (2) to be reassigned to a vacant position in an air-conditioned booth.  However, this contention is in sharp conflict with the statements he made to the SSA in his SSDI application and the medical evidence in this case.

In his SSDI application, Anderson stated that he was unable to work because of his disabling condition as of June 3, 2008, his last date of active employment with Georgia-Pacific.  (Anderson Dep. Ex. 10, Doc. #58-3, at 82.)  He further averred to the SSA that he became "short of breath with physical activity and exposure to high temperatures," and that

he uses oxygen "when going outside, when sleeping, and when needed."  (Anderson Dep. Ex. 10, Doc. #58-3, at 82.)  He went on to state that his arms and legs became numb after sitting for a few minutes, that he was quick to anger, and that he suffered from headaches throughout the day.  (Anderson Dep. Ex. 10, Doc. #58-3, at 82.)

Although Anderson argues that he could have performed the essential functions of his job with the accommodation of a respirator, and that this accommodation was not taken into account by the SSA, Anderson has directed the Court to no evidence that he was physically capable of wearing a respirator at the relevant time.  Anderson complains about Georgia-Pacific's basis for refusing to consider the accommodation of a respirator—that Brown understood that he could not wear a respirator with his condition based on the 2002 pulmonary test and the fact that he had to stop participating on the safety rescue team, where the members had to wear oxygen masks.  However, Anderson does not provide the Court with any affirmative evidence showing he was physically capable of wearing a respirator, and thus, that the use of a respirator would have been a reasonable accommodation given his medical condition.  Indeed, in July and August of 2008, while he was on paid leave, he underwent two pulmonary function tests, each showing a significant decline in his forced expiratory volume as compared with the 2002 test Georgia-Pacific relied on when it decided that Anderson was not capable of wearing a respirator at work.  It is undisputed that Anderson never submitted these 2008 test results to Georgia-Pacific in support of a request to be provided with a respirator, and that he never requested a respirator during the June 4, 2008 meeting with Georgia-Pacific.

Anderson has also failed to show that his request to be reassigned to a position in an air-conditioned booth, in particular, the senior press line operator position for which

Anderson had the requisite training, was a reasonable accommodation Georgia-Pacific could have provided him.  Anderson points to a hiring list to prove that two senior press line operator positions were filled while he was on paid leave, one in August 2008 and one in December 2008.  However, Georgia-Pacific clarified in its reply and provided supporting evidence that the list upon which Anderson relies denoted the two employees' last-held positions, rather than the positions they were hired into in 2008.  Both of the employees Anderson identifies were not hired into the position of senior press line operator until 2010.  In other words, there were no open senior press line operator positions in which Georgia-Pacific could place Anderson during the relevant time period.  (Skedgell Aff. ¶¶ 5–6 & Ex. A, Doc. #71-1.)  Thus, Plaintiff has failed to present evidence that there were any available positions (senior press line operator, or others) for which he was qualified at the time he requested them.  *See Willis v. Conopco*, 108 F.3d 282, 284 (11th Cir. 1997) ("Reassignment to another position is a required accommodation only if there is a vacant position available for which the employee is otherwise qualified.").

Moreover, even if there had been a vacant senior press line operator position available, Anderson has presented no evidence that he could have performed the essential functions of that position given the permanent restrictions Dr. Collins placed on his exposure to dust, fumes, chemicals, extreme temperatures, and humidity. Georgia-Pacific has presented evidence that the senior press line operator position would have required him to perform inspections and troubleshoot mechanical problems and perform maintenance tasks on the production floor.  Thus, even in this position, he would have been exposed to the working conditions from which he was permanently restricted.  (Anderson Dep. at 184, Doc. #58-3; Smith Decl. ¶ 4, Doc. #71-2.)  *See Dickerson v. Sec'y, Dep't of Veterans Affairs*

*Agency*, No. 11-13474, 2012 WL 3892196, at *3 n.4 (11th Cir. Sept. 7, 2012) (affirming summary judgment for employer where employee failed to identify "a reasonable accommodation that would have allowed her to avoid coming into contact with the other chemicals, substances and odors that were likely to trigger an allergic reaction"). In sum, Anderson cannot explain away the inconsistencies between his SSA and ADA claims by pointing to the fact that the SSA decision fails to take into account a reasonable accommodation, because Anderson has failed to identify any such accommodation.

Finally, Anderson argues that the facts of this case do not clearly demonstrate that he was trying to perpetrate a sham, as the district court found in *Musarra*, because, unlike the plaintiff in that case, he did not make simultaneous conflicting statements that he was disabled for the purpose of obtaining SSDI benefits and that he was ready, able, and willing to work for the purpose of obtaining unemployment compensation. *Musarra*, 343 F. Supp. 2d at 1122. Although the Court admits that the facts of this case are distinguishable from *Musarra*, the Court rejects Anderson's notion that *Cleveland* requires courts to find evidence of a sham in order to reject a plaintiff's explanation of his inconsistent SSDI statements as insufficient to support a reasonable juror's conclusion that the plaintiff could have performed the essential functions of the job, taking the statements to obtain disability as true. After consideration of the sworn statements Anderson made to the SSA and DVA, Anderson's proffered explanation for the inconsistencies between those claims and his ADA claim, and the medical evidence in this case, the Court concludes that Anderson's explanation is insufficient and that Anderson's ADA claim is thus precluded.

**B.**   **Anderson's Title VII Retaliation Claim**[11]

Anderson claims that Georgia-Pacific's failure to accommodate his disability and his administrative discharge were done in retaliation for his filing an EEOC complaint regarding race discrimination at the Thorsby facility.  To establish a prima facie case of retaliation under Title VII, "the plaintiff must show (1) that [he] engaged in statutorily protected expression; (2) that [he] suffered an adverse employment action; and (3) that there is some causal relation between the two events."  *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1363 (11th Cir. 2007).  If a plaintiff makes out his prima facie case of retaliation, "the burden shifts to the defendant to rebut the presumption of retaliation by producing legitimate reasons for the adverse employment action."  *Sullivan v. Nat'l R.R. Passenger Corp.*, 170 F.3d 1056, 1059 (11th Cir. 1999)*; see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973).  Then, if the defendant offers legitimate reasons, the presumption of retaliation disappears and the burden shifts back to the plaintiff to show that the employer's proffered reasons for taking the adverse action were pretext for prohibited retaliatory conduct. *Sullivan*, 170 F.3d at 1059.

Anderson claims that Georgia-Pacific retaliated against him for his EEOC complaint about race discrimination at the Thorsby facility by (1) not allowing Anderson to come back to work in May 2008 after his doctor placed permanent restrictions on his work environment;

---

[11]   Although in his Complaint, Anderson cites the ADA to support his retaliation claim, in its summary judgment brief, Georgia-Pacific correctly characterizes Anderson's retaliation claim as arising solely under Title VII.  Nowhere does Anderson allege that he was retaliated against for opposing an act or practice made unlawful by the ADA, or for making a charge under the ADA, as is required to establish an ADA retaliation claim.  42 U.S.C. § 12203(a); *Stewart*, 117 F.3d at 1278. Anderson alleges only that Georgia-Pacific retaliated against him for voicing complaints to the EEOC about Georgia-Pacific's purported race discrimination, which if proven, would constitute a violation of Title VII.

(2) refusing to continue to accommodate his disability as it had done in the past by allowing him to wear a respirator; (3) failing to reassign him to a vacant air-conditioned position that would not exacerbate his condition; and (4) terminating his employment. (Compl. ¶¶ 39–40; Pl.'s Corrected Br. in Response, Doc. #78, at 30.)[12]

Georgia-Pacific argues that Anderson has pointed to no evidence establishing the requisite causal link between an adverse employment action Georgia-Pacific took against him and the protected activity in which he engaged. Georgia-Pacific further argues that Anderson has failed to point to any evidence that Georgia-Pacific's legitimate, non-discriminatory reasons for placing him on paid leave, failing to provide the accommodations he requested, and terminating his employment were pretextual.

As an initial matter, the Court agrees with Georgia-Pacific that Plaintiff has not pointed to any evidence that would establish the third prong of its prima facie case—that there was a causal connection between Anderson's statutorily-protected EEOC charge and any of Georgia-Pacific's alleged adverse actions against him. In order to establish the requisite "causal link" prong of a prima facie retaliation case, a plaintiff must show that "the protected activity and the adverse action were not wholly unrelated." *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993). At a minimum, the plaintiff must generally establish, through direct or circumstantial evidence, that "the employer was actually aware of the protected expression at the time it took the adverse employment action." *Brungart v.*

---

[12]   Anderson also alleged in his Complaint that Georgia-Pacific reduced his overtime and issued him disciplinary warnings in retaliation. (Compl. ¶ 14.) However, because Anderson does not cite overtime reduction or the disciplinary warnings he received as adverse employment actions or make any arguments on these allegations in his summary judgment response brief, the Court considers any retaliation claim based on these allegations to be abandoned. (*See* Pl.'s Corrected Br. in Resp., Doc. #78, at 30.)

*BellSouth Telecomm., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000).

Although a plaintiff may establish causation by showing that the statutorily-protected activity and the adverse employment action were close in time, *id.* at 798–99, temporal proximity, without more, must be "very close." *Thomas*, 506 F.3d at 1364 (citing *Clark Cnty. Sch. Dist. v. Breeden,* 532 U.S. 268, 273 (2001)). The Eleventh Circuit has stated that "a three to four month disparity between the statutorily protected expression and the adverse employment action is not enough." *Thomas*, 506 F.3d at 1364.

Anderson has failed to direct the Court to evidence to prove the requisite causal link between his EEOC charge and any of the alleged adverse employment actions Georgia-Pacific took against him. First, Anderson has pointed to no direct or circumstantial evidence that Georgia-Pacific was aware of his EEOC charge. In his response brief, Anderson offers the following evidence to prove a causal link: (1) Brown's assertion that Dr. Collins had not released Anderson back to work; (2) Brown's refusal to send Anderson to another physician selected by Georgia-Pacific; and (3) Brown's basis for deciding that Anderson's use of a respirator was not a reasonable accommodation given his medical condition. (Pl.'s Corrected Br. in Resp., Doc. #78, at 30.) None of this evidence goes to establish that Georgia-Pacific was aware of Anderson's EEOC charge. Moreover, the temporal proximity of the protected activity and the alleged adverse employment actions in this case is insufficient, standing alone, to show a causal link. The record shows that Georgia-Pacific did not take any alleged adverse action against Anderson until early June 2008, almost three months after Anderson filed his EEOC charge on March 12, 2008. The Court concludes that this temporal proximity, without more, is insufficient to establish the causal link of Anderson's prima facie case. *See Thomas*, 506 F.3d at 1364.

Even if Anderson had satisfied the causal connection prong of his prima facie case, he has failed to rebut any of Georgia-Pacific's proffered legitimate, non-discriminatory reasons for its actions. The Court will address each action in turn.

### 1.   *Placing Anderson on Short-Term Paid Leave*

Anderson contends that Georgia-Pacific's placing him on short-term leave after receiving the medical documentation from his doctor about his permanent restrictions was done in retaliation for his EEOC charge of race discrimination. It is undisputed that prior to receiving the job requirements form that Dr. Collins filled out in May 2008, Georgia-Pacific had never before received any medical record imposing any permanent medical restrictions on Anderson. (*See* Anderson Dep. Ex. 17, Doc. #59-4, at 31–35.) Georgia-Pacific asserts that it placed Anderson on short-term leave in light of these new permanent restrictions, because it concluded that the exacerbating conditions Dr. Collins noted on the form were present throughout the Thorsby facility and that it could not reasonably exclude Anderson from all of these conditions.

Anderson has presented no evidence that would allow a reasonable juror to conclude that the company's reliance on Dr. Collins's permanent restrictions in placing Anderson on sick leave was merely pretextual. In his response brief, Anderson makes the broad statement that Georgia-Pacific does not have a legitimate, non-discriminatory reason for denying Anderson's requests for a reasonable accommodation and refers the Court to the reasoning he offered to establish his prima facie case. Accordingly, the only evidence to which Anderson directs the Court to rebut Georgia-Pacific's legitimate, non-discriminatory reason

for placing him on short-term paid leave is the evidence he cited to support the causal link prong of his prima facie case.[13]

The Court recognizes that a plaintiff may rebut the defendant's proffered non-discriminatory reasons with "previously produced evidence establishing the prima facie case sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision," *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997). However, the Court finds Anderson's statement that Georgia-Pacific's proffered reasons were not legitimate, which he fails to support with any specific evidence or argument, is an insufficient rebuttal to Georgia-Pacific's legitimate, non-discriminatory reason for removing him from the Thorsby facility. Thus, Anderson's retaliation claim as to Georgia Pacific's placing him on short-term paid leave fails.

### 2.    *Failing to Accommodate Anderson's Requests To Wear a Respirator or To Be Reassigned*

Anderson alleges that Georgia-Pacific's refusal to accommodate his requests to wear a respirator and to be reassigned to an air-conditioned position were done in retaliation for his EEOC complaint. However, Georgia-Pacific has provided evidence that it did not consider this to be a reasonable accommodation because of the 2002 test results showing that

---

[13]    Anderson pointed to the following evidence to establish the causal link prong of his prima facie case: (1) Brown's assertion that Dr. Collins had not released him back to work, (2) Brown's refusal to send Anderson to another physician selected by Georgia-Pacific; and (3) Brown's reliance on the 2002 pulmonary function test results and on the plant safety manager's representation about Anderson's ability to wear a respirator in deciding that Anderson's use of a respirator was not a reasonable accommodation. (Pl.'s Corrected Br. in Resp., Doc. #78, at 30.)

Anderson had failed a pulmonary functions test, Georgia-Pacific's understanding that Anderson had been removed from the safety rescue team because he could not wear a respirator, and Anderson's own representation that his lung condition had deteriorated since the test was conducted in 2002.  (Brown Aff. ¶¶ 9–10, Doc. #58-1.)   As for Georgia-Pacific's alleged refusal to reassign Anderson to a vacant position in an air-conditioned booth, Georgia-Pacific has presented evidence that it considered whether there were available positions that Anderson could perform, but it determined none were available.

The Court finds that these are legitimate, non-discriminatory reasons for failing to provide Anderson with his requested accommodations, which Anderson must rebut in order for his retaliation claims to survive summary judgment.  For the reasons stated previously, Anderson has provided no such rebuttal.

### 3.   *Terminating Anderson's Employment*

Georgia-Pacific administratively terminated Anderson's employment in December 2008.   Anderson alleges that this final termination was in retaliation for his EEOC discrimination complaint against the company.  However, Georgia-Pacific has explained and offered evidence that the decision to terminate Anderson was based on its determination that there was no accommodation it could make that would allow Anderson to perform the essential functions of his job.  Again, Anderson has not directed the Court to any evidence to rebut this legitimate reason for his final termination. Moreover, it is undisputed that, after going on paid leave, Anderson never submitted any further documentation from Dr. Collins or any other physician notifying Georgia-Pacific that his medical condition had improved and that the permanent restrictions on his exposure to dust, fumes, chemicals, extreme heat, and

humidity no longer applied.  Because Anderson has failed to adequately rebut Georgia-Pacific's evidence of its non-discriminatory reasons for taking any adverse employment action, Anderson's retaliation claim fails as a matter of law.

### VI. CONCLUSION

For the reasons stated above, it is hereby ORDERED that Defendant's Motion for Summary Judgment (Doc. #57) is GRANTED.  A final judgment in this case is forthcoming.

DONE this the 26th day of April, 2013.

/s/ Mark E. Fuller
UNITED STATES DISTRICT JUDGE